342 So.2d 600 (1977)
Cortez Burns ARMOUR, Plaintiff-Appellee-Respondent,
v.
SHONGALOO LODGE NO. 352 FREE AND ACCEPTED MASONS, Defendants-Appellants-Relators.
No. 58059.
Supreme Court of Louisiana.
January 24, 1977.
Rehearing Denied February 25, 1977.
Leon M. Pliner, Shreveport, A. N. Yiannopoulos, Baton Rouge, of counsel, for defendants-appellants-relators.
John B. Benton, Jr., Kitchens, Benton & Kitchens, Minden, for plaintiff-appellee-respondent.
PER CURIAM.
Plaintiff, Cortez Burns Armour, brought suit against the Shongaloo Lodge to have declared null and void the lease under which the lodge occupied a meeting hall. The defendant lodge reconvened and demanded specific performance of the lessor's obligation to maintain the foundation of the lodge hall. The trial court found the lease null in that no price was contained and rejected the lodge's demand for specific performance. The court of appeal affirmed. 330 So.2d 341 (La.App.2d Cir.1976).
We granted certiorari, 333 So. 245 (La. 1976), to review the judgment of the lower court.
*601 A majority of the court is of the opinion that the agreement confected by the parties is a valid contract. We have considered the arguments made, including lack of serious consideration, prescription against the action in nullity, and the classification of the contract as a loan for use. We have also considered the applicability of the theory of imprevision, the judicial revision of contracts. However, a majority of the court is unable to reach agreement upon which ground to uphold the validity of the contract.

Lessor's obligation to support the foundation
Under the agreement, the owner of the premises is bound to keep the foundation of the building in good repair as to support the second floor. It is argued by plaintiff that it would cost in excess of $18,500 to put the first story in good repair. An examination of the record reveals that the estimate presented at trial is actually an estimate as to the cost of putting the first story in "first class shape."
Under the contract, the plaintiff is not obligated to maintain the first floor in "first class shape", but is simply obligated to maintain support for the second story or lodge hall. The evidence before the trial court provides an insufficient basis upon which to make an award to accomplish this end.
The case must therefore be remanded to the trial court for it to receive evidence and make a determination of this award.
In the remand, the following principle may be availed of by the parties: The real obligation to furnish the support for the second floor of the building established by the contract, Civil Code Article 2015, may be satisfied by the obligor (the owner of the premises) abandoning the building and the land under it to the obligee (the defendant) under the contract, Civil Code Article 2012.

Decree
Accordingly, the judgments of the court of appeal and the district court are reversed and set aside. The case is remanded to the trial court for consideration of defendant's reconventional demand, not inconsistent with the views expressed herein. All costs of these proceedings to be taxed upon final disposition of these proceedings.
REVERSED AND REMANDED.
SUMMERS, J., concurs in the result and assigns reasons.
SUMMERS, Justice (concurring).
For some time before the year 1950 Shongaloo Lodge No. 352, Free and Accepted Masons (Lodge) maintained a meeting hall it had constructed as the second floor of the Roseberry Building in the small town of Shongaloo in Webster Parish. The rights of the Lodge were held under a 99 year lease dated January 16, 1918.
The Department of Highways found it necessary to acquire rights of way to reconstruct the Shongaloo-Arkansas Highway, La. No. 66, and to acquire certain lands adjacent thereto. The Roseberry Building was located within the area which the Department would absorb in the project. To accommodate this need, on April 24, 1950 the Department acquired the rights of way and paid the Lodge $1,500 to remove the second story of the Roseberry Building and cancel their 99 year lease.
Andrew Clark Burns was then a member of the Lodge. After an effort to locate a meeting hall on lands adjacent to a nearby church was unsuccessful, he granted a lease to the Lodge on November 22, 1950.
The lease set forth that he was then "constructing the bottom or first story of a frame building 30 by 60 feet, suitable for the placing of a second story by the . . [Lodge], said second story to be used exclusively and solely for a meeting place for the said Masonic Lodge named herein."
The agreement further provided that the Lodge would have "exclusive use and control of the . . . upper or second story of the said Burns building, and the same is hereby leased and rented to them for a period of NINETY NINE (99) YEARS *602 from the date of this contract." Burns, according to the agreement, was to have exclusive use and control of the lower or first story of the building.
In further consideration of the lease of the upper or second story to the Lodge by Burns it was stipulated that the Lodge, "in addition to building the said upper or second [story]", agreed to pay the taxes on the second story and to keep the second story and the roof in repair "as may be necessary to keep it in suitable use as a Lodge room for use and control" of the Lodge.
Burns also agreed "to keep the foundation of the said building in good and substantial repair and condition and to keep the posts, walls and studding of the ground or first story of said building in such conditions that they will at all times substantially support the said upper or second story."
The lease was to be considered terminated and null and void if the building was destroyed by fire or an Act of God.
The document was executed by the parties in authentic form before a notary and two witnesses.
After execution of the lease Burns completed the ground floor; and the Masons, using the $1,500 received from the Department, the materials salvaged from their meeting hall in the Roseberry building, and the volunteered labor of the membership, constructed the upper story. They have used and maintained these premises as a meeting hall until the present time.
Burns established a grocery store on the ground floor which he operated until 1953. He then leased that area to A. T. Matthews at a monthly rental of $25.
In 1955 Burns died and his widow and Cortez Burns Armour, his daughter, owned the property. Until the widow's death, the lease arrangements with the Lodge and Matthews continued. After her death the arrangements were continued by the daughter as sole owner until Matthews died on April 17, 1974. Shortly thereafter the daughter Armour requested that the Lodge vacate the premises. The Lodge refused and responded by requesting that she repair, according to the contract, the deteriorated foundation and structural members supporting the upper floor of the building.
This suit followed on December 2, 1974 in which Cortez Burns Armour, as plaintiff, sought to have the agreement with the Lodge dated November 22, 1950 declared null and void; she also sought eviction of the Lodge and prayed that possession of the premises be delivered to her. The bases of plaintiff's suit are that the lease contains no fixed, certain and determinate price as required by Articles 2669, 2670 and 2671 of the Civil Code, and that there exists no serious consideration to sustain the lease.
As defendant, the Lodge denied these allegations, asserting the validity of the agreement as a lease or, alternatively, as a donation inter vivos by Andrew Clark Burns to his Masonic Lodge. In reconvention the Lodge sought specific performance of the plaintiff's obligation under the agreement to keep the foundation of the building in good and substantial repair.
After trial, judgment was rendered in favor of plaintiff declaring the agreement null and void for lack of a serious consideration. On appeal to the Second Circuit the judgment was affirmed. 330 So.2d 341. Certiorari was granted on defendant's application to review the issues thus presented. 333 So.2d 245. While the matter was pending in this Court, before submission, defendants filed a plea of prescription of five and ten years to the plaintiff's action of nullity based upon Articles 3542 and 2221 of the Civil Code, respectively.
No pleas of prescription were filed in the trial court, and, although similar pleas of prescription had been filed in the Court of Appeal, they were not considered by that court, for they were filed after the case was submitted. In this Court, however, the pleas are timely and will be considered for the purpose of this concurring opinion.
"Prescription may be pleaded in every stage of a cause, even on the appeal, but it ought to be pleaded expressly and specially before the final judgment." La. Civil Code art. 3464.
*603 An "appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to submission of the case . . ." La. Code Civ.Pro. Art. 2163. This Court hearing a case on a writ of certiorari is considered as an appellate court within the contemplation of Article 2163. La.Const. art. V, § 5(F) (1974); Gulotta v. Cutshaw, 283 So.2d 482 (La.1973). Thus, this Court "may" in its discretion, consider peremptory exceptions filed here for the first time.
The exception to this rule lies in Article 3465 of the Civil Code to the effect that "prescription can not be pleaded in the Supreme Court, unless the proof of it appear from documents exhibited or testimony taken in the inferior court." Finding that proof of the facts requisite to a consideration of the pleas of prescription appears from the documents and testimony received at the trial in the district court, no obstacle to adjudication of the issue in this Court is presented.
The Articles of the Civil Code relied upon to support defendant's pleas of prescription provide:
"Art. 3542. The following actions are prescribed by five years:
That for the nullity or rescission of contracts, testaments or other acts.
That for reduction of excessive donations.
That for the rescission of partitions and guarantee of the portions.
This prescription only commences against minors after their majority."
"Art. 2221. In all cases, in which the action of nullity or of rescission of an agreement, is not limited to a shorter period by [a] particular law, that action may be brought within ten years."
Each of the foregoing articles applies to actions of "nullity or rescission" of agreements or contracts. Article 2221 is broader in scope and applies to all agreements, while Article 3542 applies to "contracts", "reduction of donations" and "rescission of partitions". The time difference is unimportant here, however, because the relevant period begins on November 22, 1950, the date of the contract, and extends to the date the plea of prescription was asserted, June 21, 1976, a period exceeding 25 years. Under either time period, therefore, more than sufficient time has elapsed to satisfy that element of the prescriptive plea.
Plaintiff's principal defense to the plea of prescription is that the time periods of five and ten years allowed to institute actions for nullity or rescission of agreements or contracts, which Articles 3542 and 2221 establish, do not apply in this case because the nullity complained of by plaintiff is absolute, not relative, and as such the action is imprescriptible.
Agreements legally entered into have the effect of laws on those who have formed them. They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. They must be performed in good faith. La. Civil Code art. 1901.
All things that are not forbidden by law may legally become the subject of, or the motive for, contracts. La. Civil Code art. 1764. Thus, conditions in contracts which are impossible, repugnant to moral conduct, or prohibited by law are null and render void the agreement which depends on them. La. Civil Code arts. 11, 1892, 1895, 2031. These conditions do not exist in the contract before the Court.
The Louisiana Civil Code contains no definition of absolute and relative nullity. However, the concepts of absolute and relative nullities are found in the Codes of France and Louisiana. From the writings of Demolombe, Laurent and Planiol, definitions have been formulated which are consistent with these concepts:
"(1) A relatively null contract can be validated by ratification or confirmation. Such ratification is a renunciation of the action for annulment. The contract becomes as valid as if it had been regular at its formation. Conversely, an absolutely null contract cannot be ratified. The nullity exists before any judgment is pronounced, because an absolutely null contract, although having the appearances of *604 a valid agreement has no legal existence. It cannot be ratified because it is impossible to confirm a non-existence.
"(2) The right of action to declare a relative nullity is available only to the incapable person or to one whose consent has been defective. With regard to all other persons, including the other party to the contract, the contract is valid. Conversely, any interested party may have the court declare the nullity of an absolutely null contract.
"(3) The right to assert a relative nullity may be lost by prescription, but the right to have the nullity of an absolutely null contract is imprescriptible.
"(4) The relative nullity does not affect the contract at its formation. The agreement produces ordinary effects until it is annulled by a judgment, at which time its nullity is retroactive. Conversely, a cause of absolute nullity prevents the formation of a contract. Consequently no contractual effects are ever produced." Note, 38 Tul.L.Rev. 755, 756 (1964). See generally Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582 (1953); Whitney National Bank v. Schwob, 203 La. 175, 13 So.2d 782 (1943).
In referring to circumstances which produce the vice of consent, which gives a right of action to declare a relative nullity, Planiol cites as an example the pecuniary damage a juridical act causes the person who has entered into it. The vice of consent arises in the case of pecuniary damage, he writes, in two situations: where the party affected knew of the damage he would sustain or where he did not know of it. In the first case, according to Planiol, his consent must not have been free, for he is considered to have consented under the influence of a pressing necessity; in the second case, it is error, which also vitiates valid consent. The defective consent permits the party involved to assert an action of rescission based upon the relative nullity. Planiol, Civil LawTreatise, Vol. I, Part I, No. 284 (English Translation, La. State Law Institute).
These principles are applicable to the claim asserted here that the lease contract should be declared null for lack of a serious consideration.
A lease is a "contract" by definition. La. Civil Code art. 2669. The principal contention that the consideration in the lease in question is not serious is a claim that the lease is relatively null because the party asserting the nullity claims a pecuniary damage by the contract of lease. The action for nullity or rescission is, therefore, lost by the passage of time prescribed by law. La. Civil Code art. 3542. The plea of prescription of five years should therefore be maintained.
A right of action cannot be sustained forever; issues of law must have a resolution, either by affirmation or rejection in a court of law, or by the passage of time. One against whom a cause of action exists must be eventually liberated of the apprehension it creates. Articles 2221 and 3542 of the Civil Code provide for this liberation. Lee Lumber Co. v. International Paper Co., 321 So.2d 42 (La.App.1976), cert, denied, 324 So.2d 423. By the long and continued acquiescence the lessor has tacitly approved the lease.
Furthermore, in firm reliance upon the contract, the Lodge has, over the years, made significant improvements and repairs to the building at considerable expense and with volunteered labor by its members.
The contract provision requiring plaintiff to maintain the foundation and structure of the building supporting the second floor occupied by defendants does not lend itself to specific performance. When the contract requires continued supervision by the Court, as it would here, and necessitates personal services on the part of the lessor for its accomplishment, specific performance will not be required.
In my view the per curiam opinion of the majority fails to meet the issues or give reasons for its judgment. I therefore concur in the result only for the reason I have assigned.