The McCARTY CORPORATION, Plaintiff-Appellant Cross-Appellee,

v.

PULLMAN–KELLOGG, DIVISION OF PULLMAN, INC., Defendant-Appellee Cross-Appellant.

No. 83–3504.

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1985.

---

Schwab & Walter, Gerald L. Walter, Jr., Baton Rouge, La., John B. Tieder, Jr., Garry R. Boehlert, Washington, D.C., for plaintiff-appellant cross-appellee.

Montgomery, Barnett, Brown & Read, Daniel Lund, New Orleans, La., for defendant-appellee cross-appellant.

Before THORNBERRY, GARWOOD and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal and cross-appeal from a final judgment in a diversity case in the United States District Court for the Middle District of Louisiana. The district court, applying Louisiana law, annulled a contract between the McCarty Corporation and Pullman-Kellogg and awarded McCarty recovery of $490,497.92 plus interest from the date of judicial demand. *McCarty Corp. v. Pullman-Kellogg*, 571 F.Supp. 1341 (M.D. La.1983). McCarty, the plaintiff in the district court, appeals, claiming that the court erred in failing to award McCarty recovery for amounts attributable to overhead and profit. Pullman-Kellogg, the defendant in the district court, cross-appeals, challenging the annulment of the contract, the amount of the award, and the award of prejudgment interest. We affirm the district court's annulment of the contract, we reverse the award of prejudgment interest, and we remand the case to the district court for further evidence and findings on the issue of the amount of the award.

## I. THE FACTS

The plaintiff, McCarty Corporation ("McCarty"), is a Louisiana corporation with its principal place of business in Port Allen, Louisiana. McCarty is engaged in the commercial and industrial insulation business. The defendant, Pullman-Kellogg ("Pullman"), is a Delaware corporation with its principal place of business in Houston, Texas. Pullman is in the business, *inter alia,* of engineering and constructing industrial plants, including oil refineries.

Pursuant to a contract between Pullman and Shell Oil Co., Pullman was the prime contractor in an expansion of Shell's Norco refinery complex. Pullman subcontracted out much of the work, including the insulation work. This case involves the insulation subcontract between Pullman and McCarty. The primary controversy in this case concerns the fact that McCarty's bid was based on a mistaken understanding regarding the type and scope of the insulation work to be done. The issue is whether, under the particular circumstances of this case, McCarty's misunderstanding constituted error in the principal cause of the contract sufficient to justify annulment of the contract.

On September 6, 1978, Pullman sent a telex message to prospective insulation subcontractors requesting background information. The telex stated that the "preliminary cost estimates indicate overall project scope to be in excess of fifteen million dollars and in excess of one half million man hours required." Pullman also stated in the telex that it anticipated obtaining bids for the complete project but that the insulation work might be divided among two or three insulation applicators, in which event the subcontract packages "could possibly average four to six million dollars each and approximately two hundred thousand man hours each." McCarty received one of these telexes.

On October 9, 1978, Pullman sent to McCarty and others an Invitation to Bid. The Invitation stated that the insulation work consisted of one large unit, referred to as the "01" unit, and three smaller units, referred to as the "02," "03," and "04" units. Part IV, paragraph 7.1 of the Invitation to Bid stated that it was Pullman's preference to award all of the insulation work to one contractor; however, it was reserving the option to divide the work into three parts. The three parts were denominated as Plots A, B, and C. Plots A and B would each be contracts for approximately 35% of the work on the 01 unit. Plot C would be a contract that included the common offsite work on the 01 unit (amounting to approximately 30% of the total work to be done on the 01 unit) and would also include all of the work on the three smaller units. Common offsite piping is the piping that inter-connects the vessels and towers. The district court found that the term "common offsite piping" as used in Paragraph 7.1 of Part IV of the Invitation to Bid, is generally understood to be long straight sections of pipe twenty to twenty-five feet off the ground.

The Invitation to Bid asked for a lump sum bid on the insulation of equipment—vessels and towers—and for unit price bids

on piping and instrument insulation. Each bidder was to express the unit prices as "x" number of dollars per lineal foot of the various sizes of piping insulation. The Invitation called for unit price bids because the specifications for the piping and instruments had not been completed at that time. The Invitation also contained the following provisions in Section III:

Par. 1.3. Oral explanations and interpretations made prior to the bid opening shall not be binding.

Par. 1.4. Should a bidder find discrepancies in or omissions from, the drawings or specifications, or be in doubt as to their meaning, he should at once notify the Contractor in writing who will send instructions to all on record as having drawings and specifications. The Contractor will not be responsible for any oral instructions.

Par. 1.7. Any estimate of volume of work set forth on drawings and/or specifications is not binding upon Contractor and is offered as an indication of scope of work only.

Sometime in September or October of 1978 Pullman representatives W.T. Smith and Duncan Kinchen held a pre-bid meeting in Houston. Mr. Smith was the official Pullman spokesman for bidding matters and Mr. Kinchen was Pullman's senior insulation engineer and in-house expert on insulation matters. Mr. M.R. McCarty, president of McCarty Corp., attended the meeting. Smith and Kinchen told Mr. McCarty that the insulation work would total between eighteen and twenty million dollars and that the work was divided into three parts of approximately equal value. They also told Mr. McCarty that the work would probably be awarded to two contractors, in which case the work would be split on a two-thirds—one-third basis. Mr. Kinchen told Mr. McCarty that Pullman felt only one of the bidders was capable of performing as much as two-thirds of the work.

Using the information furnished by Pullman, specifically including the telex, Part IV, par. 7.1 of the Invitation to Bid, and the representations made by Smith and Kinchen, McCarty prepared its bid. On the basis of what Mr. Kinchen had told Mr. McCarty, McCarty concluded that it would receive one-third of the project or none at all, and given the company's capabilities, it would probably receive the work denominated as Plot C which consisted of the common offsite work and units 02, 03, and 04. Although McCarty bid on the entire project, it tailored the bid towards Plot C. McCarty first prepared its lump sum bid for the equipment insulation and then calculated the unit price for piping and instrument insulation. Based on the estimates of the total value of the work to be done in Plot C and the percentage of the work that was common offsite piping, McCarty calculated that the common offsite work would run about three and one half to four million dollars, or over 50% of the total amount of the work in Plot C. The common offsite work represented over 70% of the work in Plot C that was to be bid in unit prices. Insulation of common offsite piping is relatively easy work and requires less labor per unit than do other types of insulation work. McCarty concluded that the vast amount of common offsite piping would enable it to reduce its labor costs; therefore, in calculating its unit price bid, it reduced its weighted average unit prices for labor by approximately 20%.

On November 17, 1978, McCarty submitted its bid to Pullman. McCarty was the low bidder on the project, but Pullman decided that because of the size of the project McCarty did not have the capacity to do all of the work. Therefore, Pullman split the job for award to two insulation subcontractors. Pullman awarded two thirds of the work, Plots A and B, to Anco Insulation and awarded Plot C to McCarty. On April 26, 1979, McCarty and Pullman entered into a contract which formally awarded Plot C of the insulation work to McCarty. The total firm lump sum cost of the work was set at $1,472,587.00. The unit prices on piping and instrument insulation that McCarty submitted in its bid were incorporated into the contract for the purpose of pricing the work as it was released

by Pullman for insulation. The contract also contained the following provision:

SUBCONTRACT INCLUDES ENTIRE AGREEMENT:

This Subcontract embodies the entire agreement between Contractor and Subcontractor. Subcontractor represents that in entering into this Subcontract it does not rely on any previous oral or implied representation, inducement, or understanding of any kind. Any changes in the provisions of this Subcontract, or in the attachments hereto made subsequent to the execution hereof, shall be made in writing and executed in the same manner as this Subcontract.

McCarty started work under the contract on March 15, 1979. After the contract for Plot C was awarded to McCarty, Pullman substantially reduced its estimates of the number of man hours and the cost of the work in Plot C. Pullman did not inform McCarty of the reduction. After all of the work was released, the actual amount of work in Plot C was approximately 2.75 million dollars rather than the estimated four to six million dollars. The amount of common offsite work actually totalled only $330,000.00 rather than the estimated 3.5 to 4 million dollars. When McCarty completed the work, the common offsite work amounted to only about 12% of the total work in Plot C and less than 26% of the work to which unit prices were applied.

The dispute concerns McCarty's reduction of its unit price bid on the assumption that the project was very large in scope and that over 70% of the work on which it was bidding unit prices was common offsite work. The discount in McCarty's bid was based on what turned out to be faulty assumptions. Since the project was so much smaller than estimated and since the percentage of relatively easy common offsite piping was substantially less than estimated, the work required a much higher average labor per unit than expected, and McCarty lost money on its labor costs.

In the district court McCarty sought, *inter alia*, annulment of the contract because of error in the principal cause of the con-

tract, claiming that Pullman had misrepresented the type and scope of the work. Pullman responded that it had repeatedly stated that its representations were not binding and that any assumptions McCarty made in its bid were not communicated to Pullman and were made at McCarty's own risk. The district court found that both parties negotiated and entered the contract in good faith but that the estimates Pullman gave regarding the type and scope of the work were grossly in error. The district court concluded there was error in the principal cause of the contract and annulled it.

## II. ANNULMENT OF THE CONTRACT

■ The district court annulled the contract because it found that there was "error in the principal cause of the contract." Essentially, this means that the court found that when McCarty entered into the contract he was laboring under a mistake of fact that was induced by Pullman and that went to the heart of the contract. Under Louisiana law, a contract is created only when there is mutual understanding and consent to the agreement. Consent to contract may be vitiated if fraud, error, violence or threats induce the consent. La. Civ.Code Ann. art. 1819 (hereinafter "Art. xxxx"). When actual consent is found to be lacking, the contract becomes voidable and may be annulled. Art. 1881. Under the civil law concept of error, when there is a unilateral error that was induced by the innocent misrepresentations of the other party, the contract is voidable only if: (1) there was justifiable reliance on the misrepresentations, (2) the error bears upon the principal cause of the contract, and (3) the party who made the misrepresentations knew or should have known that its representations would be relied upon. *Cryer v. M & M Manufacturing Co., Inc.*, 273 So.2d 818 (La.1972); *see also*, Arts. 1822, 1824, 1825, and 1826. The "principal cause" of the contract is the party's primary motive for entering into the contract or the basis upon which the parties contracted. Arts. 1825 and 1896.

The district court found that Pullman made innocent misrepresentations regarding the type and scope of the work to be done in Plot C and that McCarty's assumptions regarding the type and scope of the work were all based on Pullman's representations. The court also found that McCarty's understanding of the type and scope of the work was the basis upon which it prepared its unit price bid and later entered into the contract. The court found that had McCarty known the actual type and scope of the work in Plot C, it would not have entered into the contract at reduced unit prices. Finally, the district court found that McCarty was justified in relying on Pullman's representations and that Pullman should have known that its representations would be relied upon. The court concluded from its findings that there was error in the principal cause of the contract that vitiated consent and made the contract voidable. Accordingly, the court annulled the contract.

█ Pullman's cross-appeal challenges each of the district court's fact findings necessary to its conclusion that the contract should be annulled. The "clearly erroneous" standard of FRCP 52(a) governs our review of the district court's findings of fact.

Pullman challenges the following findings of fact: (1) that Pullman made misrepresentations that were justifiably relied upon; (2) that McCarty's reliance was reasonable; (3) that Pullman knew or should have known that its representations would be relied upon; and (4) that the type and scope of the work in Plot C was the principal cause of the contract. We hold that the evidence in the record supports each of these findings and that none of the findings is clearly erroneous.

a. *Justifiable Reliance*

█ Pullman contends that the information in the telex—that in the event the work was divided into three contracts each contract "could possibly" amount to four to six million dollars—is not the type of representation that reasonable businessmen rely on without inquiry, confirmation, or conditioning of a bid. The district court found, however, that McCarty did make further inquiry and that the information was confirmed by Pullman's representatives.

Pullman also contends that McCarty was not justified in relying on the representations regarding the type and scope of the work because of clauses in the Invitation to Bid which stated that "[o]ral explanations and interpretations made prior to the bid opening shall not be binding," and "[a]ny estimate of the volume of work set forth on drawings and/or specifications is not binding upon Contractor and is offered as an indication of scope of work only." Pullman also points to the integration clause in the contract that states that the subcontractor is not relying on any previous oral or implied representations. As discussed below, the district court found that the representations made by Pullman in the telex and by its representatives at the pre-bid meeting were made for a purpose. The court found that Pullman should have known that the representations would be relied upon and that, in fact, Pullman intended that there be some degree of reliance. These findings are supported by the record. Given these findings, Pullman cannot be allowed to totally disassociate itself from the representations.

McCarty is not arguing that Pullman should be bound to the exact figures quoted in its estimates. Pullman's representations of the scope of the work were not issued as guarantees and neither party expected the estimates to be completely accurate. What McCarty expected was that Pullman's representations were reasonably indicative of the actual type and scope of the work. In its opinion, the district court stated:

> While Pullman-Kellogg should not be held to absolute accuracy of its estimates, it is not unreasonable to hold it to a reasonable degree of accuracy, where the information is furnished with knowledge that the bidder has no other information upon which to rely in making his bid.

*McCarty Corp. v. Pullman-Kellogg,* 571 F.Supp. 1341, 1361 (M.D.La.1983). We agree with the district court.

In light of the particular facts of this case, the district court was not clearly erroneous in finding that McCarty was justified in relying on Pullman's representations as being reasonably indicative of the type and scope of the work to be done. We also hold that the district court's finding that Pullman's representations were grossly in error is not clearly erroneous.

b. *Reasonable Reliance*

■ Pullman argues that even if McCarty was justified in relying on its representations regarding the type and scope of the work, McCarty's inferences from the information provided were unreasonable. It is undisputed that McCarty's reduction of its unit price bid was based on the following assumptions: (1) if McCarty was to receive any part of the insulation work it would receive a contract for Plot C only; (2) the work to be performed in Plot C amounted to approximately four to six million dollars; (3) the common offsite work to be done in Plot C amounted to roughly three and one half to four million dollars; (4) insulation of common offsite piping requires less labor per unit than does other insulation work. Pullman argues that the district court's finding that these assumptions were reasonable was clearly erroneous. We do not agree.

Pullman contends that McCarty had no grounds to infer that it would receive the contract for Plot C and thus should not have tailored its bid towards Plot C. The district court found to the contrary. At the pre-bid meeting in Houston, Mr. Kinchen told Mr. McCarty that only one of the bidders had the capacity to take on two-thirds of the project or the whole project. The district court found that Mr. Kinchen was referring to Anco Insulation. McCarty then decided that it would receive one-third of the project or none at all, and given the company's capabilities, it would probably receive Plot C. In fact, Pullman did award McCarty Plot C and awarded Anco the other two-thirds of the project. Although McCarty was the low bidder on the entire project, Pullman decided that McCarty did not have the capacity to perform over one-third of the work. Clearly, McCarty's inferences from the information it received from the Pullman representatives were reasonable.

After reviewing the record, we find that the second and third assumptions were reasonably based on Pullman's representations. Moreover, the stipulated facts show that McCarty's estimates were nearly identical to Pullman's initial in-house estimates, the details of which were not released to the bidders. According to the in-house estimates, the total estimated value of the insulation work was $19,792,170.00 (represented to McCarty to be between eighteen and twenty million dollars), the total estimated value of the work in Plot C was $6,667,170.00 (represented to McCarty to be between four and six million dollars), and the estimated amount of common offsite work in Plot C was $3,792,000.00 (calculated by McCarty to be between three and one half and four million dollars). The district court found that these in-house estimates were "undoubtedly the basis for" the representations made by Pullman to the bidders.

The last assumption McCarty relied upon in deciding to reduce its unit price bid was that insulation of common offsites required less labor per unit than other insulation. McCarty reduced its weighted average unit price bid by about 20% because it believed that over half of the work to be done in Plot C was common offsite work and over 70% of the work that was to be bid in unit prices was common offsite work. The record supports the district court's finding that McCarty's assumption was reasonable. Mr. Kinchen, who was Pullman's senior insulation engineer and who was qualified as an expert in industrial insulation and estimating at trial, testified that common offsite piping is easier to insulate and that it is reasonable for a bidder to reduce his unit price bid for insulation of common offsites. He also testified that it was not

unusual for costs to be reduced as much as 40% when the work is offsite piping insulation.

McCarty's assumptions regarding the type and scope of the work to be done were wholly based on representations made to it by Pullman. The district court found that the information was necessary for the bidders to prepare intelligent bids. Moreover, as Pullman's own in-house estimates show, the figures relied upon by McCarty in formulating its bid were reasonable. The district court's findings were not clearly erroneous.

### c. *Pullman's Knowledge of Reliance*

The district court found that Pullman intended for the bidders to rely to some degree on its representations regarding the volume of the work. This finding is not clearly erroneous. Mr. W.T. Smith, Pullman's bidding representative, testified that most insulation subcontracts in the petroleum industry average two or three million dollars and that Pullman intentionally gave the bidders estimates of the volume of the work so that they would know that this was an exceptionally large contract and to assure that they would prepare their bids accordingly.

The district court found that Pullman also had another reason for giving the bidders estimates of the nature and volume of the work. The court found that Pullman was under a duty by virtue of its prime contract with Shell to try to get quantity discounts from the bidders. Paragraph 21 of the prime contract between Pullman and Shell provided in part as follows: "In bidding, CONTRACTOR shall expose to the bidders the maximum quantities required by the work so as to obtain all price and service concessions due to volume." McCarty's 20% decrease in its unit price bid was no more than a quantity discount based on the representations of the type and scope of the work. It was not clear error for the district court to conclude that Pullman knew or should have known that the bidders would rely on its representations.

### d. *Principal Cause of the Contract*

■ Pullman next argues that even if McCarty labored under a reasonable factual error that was induced by Pullman, the error could not have been related to the principal cause of the contract. Pullman argues that in a unit price contract, where the total volume of the work is unknown, an error as to the type and scope of the work cannot be the principal cause of the contract. Pullman contends that when someone is bidding a unit price contract, the type and scope of the work is irrelevant because the unit price bid will apply regardless of the volume of the work or the type of the work.

McCarty persuasively argues that in an insulation job such as this one, the type of insulation work to be done and the amount of the work governs the formulation of a unit price bid. The type of work is relevant because the labor required to do different types of insulation work varies greatly. The insulation of common offsite piping requires much less labor than other types of insulation. When a single unit price is to be applied to all of the unit price work, the volume of the work and the amount of common offsite work relative to the total are crucial factors. (There were separate unit price bids for the various sizes of piping insulation, but the same unit prices applied both to offsite piping and other work.) Without some idea of the type and scope of the work, an intelligent bid, even a unit price bid, could not have been made. The district court so found.

Pullman's argument relies on the assumption that the total volume of the work is completely unknown when the bids are entered. That was not the case here. Pullman did make representations to the bidders about the type and scope of the work that were based on its in-house estimates. The district court found that these representations were made in order to aid the bidders in formulating their bids. Although the bidders knew there was no firm maximum or minimum volume of work, they could rightfully assume that the esti-

mates were reasonably indicative of the actual work to be performed. McCarty justifiably and reasonably relied on Pullman's representations of the type and scope of the work, those representations formed the basis of McCarty's unit price bid, and the unit price bid was the basis upon which the parties entered into the contract. Under these circumstances, the type and scope of the work was the principal cause of the contract even though the contract was based on unit price bids. This finding is supported by the Louisiana case law.

In *Sylvester v. Town of Ville Platte*, 218 La. 419, 49 So.2d 746 (1950), the town solicited bids for moving a gas pipeline. In preparing his lump sum bid, Sylvester found that there were no specifications for the work. Sylvester believed that in order to prepare an intelligent bid he needed to have an idea of the amount of work to be done, so he went to the two men in charge of the gas system. They told him that there were twelve or thirteen and "not over 14" gas connections to be moved. Sylvester prepared his bid and was awarded the contract. As it turned out, there were 41 connections to be moved. The court found that had it not been for the representation that there were only twelve to fourteen gas connections to be moved, Sylvester's bid would have been much higher. The Louisiana Supreme Court held that if Sylvester was entitled to rely on the representations of the town's employees then the contract was subject to annulment because of lack of consent due to misrepresentation and error. 49 So.2d at 749. The court found that the employees were authorized to make the representations and that Sylvester was entitled to rely on them, and the contract was annulled because of error in the principal cause. *Id.*, at 750. Pullman tries to distinguish *Sylvester* on the sole ground that *Sylvester* involved lump sum bidding whereas our case involves unit bidding. That factual distinction does not warrant a different result in our case. In both cases the bids were based primarily on representations as to the type and scope of the work to be performed under the con-

tract, and the representations turned out to be grossly in error.

Although we have found no Louisiana case that is directly on point, the cases on error do support the proposition that when a bid is prepared on the basis of erroneous information regarding the type and scope of the work and the information was provided by the other party, the contract may be annulled because of error in the principal cause. *See, North Development Co., Inc. v. McClure*, 276 So.2d 395 (La.App. 1973). In our case the estimates of the volume and the type of work to be done were crucial in McCarty's preparation of its bid. The estimates regarding the type and scope of the work clearly were the principal cause of McCarty's contract. He entered into the contract at reduced unit prices on the basis of the estimates. Since we have upheld the district court's findings that McCarty was justified in relying on the estimates and that it was reasonable for McCarty to prepare its unit price bid on the basis of the estimates, this contract was subject to annulment because of error. Given the particular facts of this case, the district court did not err in annulling the contract because of misrepresentation and error.

Pullman repeatedly cites three cases in support of its position: *Ardoin v. Central Louisiana Electric Co., Inc.*, 318 So.2d 5 (La.1975); *First National Mortgage Corp. v. Manhattan Life Ins. Co.*, 360 So.2d 264 (La.App.1978); and *Louisiana Power & Light Co. v. Allegheny Ludlum Industries, Inc.*, 517 F.Supp. 1319 (E.D.La.1981). Each of these cases is distinguishable from our case for one reason. In each of these cases there was a unilateral erroneous assumption that was *not* induced by representations of the other party. In our case the erroneous assumptions were induced by Pullman's representations.

### III. PAROL EVIDENCE

 The district court allowed McCarty to introduce evidence of the parol statements of Pullman representatives Smith and Kinchen. Pullman objected. The law

in Louisiana is clear that parol evidence is admissible for the purpose of establishing that an agreement is subject to annulment because of lack of consent due to misrepresentation and error. *Sylvester v. Town of Ville Platte*, 218 La. 419, 49 So.2d 746 (1950); *Nugent v. Stanley*, 336 So.2d 1058, 1063 (La.App.1976).

## IV. AMOUNT OF RECOVERY

■ After annulling the contract, the district court held that McCarty was entitled to recover from Pullman under the doctrine of unjust enrichment. Under Louisiana law recovery may be had for unjust enrichment only if the plaintiff proves the amount of his impoverishment and that the defendant was enriched to that extent. *Brignac v. Boisdore*, 288 So.2d 31, 35 (La. 1973). The district court found that McCarty proved its actual out-of-pocket costs for material and labor and also proved that Pullman had been enriched by those expenditures. The court found that McCarty did not prove that Pullman was enriched by the amount of general overhead and profit McCarty sought. The court awarded McCarty recovery of its out-of-pocket material and labor costs and credited Pullman for amounts already paid.[1] Interest was awarded from the date of judicial demand. McCarty appeals, claiming the court should have awarded it recovery on quantum meruit and that McCarty should have recovered its general overhead expenses and reasonable profit. Pullman cross-appeals, claiming that the court erred in finding that Pullman had been enriched to the full extent of McCarty's out-of-pocket costs. Pullman also challenges the award of prejudgment interest.

### a. *Measure of Recovery*

■ Under the Louisiana case law, when a contract for services is annulled because of error in the principal cause, the recovery is on quantum meruit. *See, Sylvester v. Town of Ville Platte*, 218 La. 419, 49 So.2d 746, 750 (1950); *Swiftships, Inc. v.*

*Burdin*, 338 So.2d 1193 (La.App.1976); *North Development Co., Inc. v. McClure*, 276 So.2d 395, 400 (La.App.1973). Under the theory of quantum meruit, a party performing services is entitled to be paid the reasonable value of his services. "The determination of this amount owed by the party receiving the benefit shall be derived from a reasonable evaluation of the services performed as adjusted to the circumstances of the individual situation." *Swan v. Beaubouef*, 206 So.2d 315, 317 (La.App. 1968). The amount a plaintiff can recover on quantum meruit is the reasonable value of the services, labor and materials, including overhead and profit, he has provided to the defendant, subject to the following limitations: (1) Plaintiff cannot recover more than the actual value of the materials and labor furnished, including general overhead and a reasonable profit, and (2) plaintiff cannot recover more than the amount the defendant was enriched by the services. *C.f., Houma Armature Works & Supply, Inc. v. Landry*, 417 So.2d 42, 43–44 (La. App.1982); *Swiftships, Inc. v. Burdin*, 338 So.2d 1193, 1196 (La.App.1976); *Brummett v. Hamel's Dairy, Inc.*, 324 So.2d 502, 505 (La.App.1975). The plaintiff bears the burden of proving the value of the materials and labor, the overhead attributable to the job, and what is a reasonable profit. *Swiftships*, 338 So.2d at 1196. Such proof makes a prima facie case for recovery. It is the defendant's burden to urge and prove as a defense that the sum claimed by the plaintiff exceeds the actual value of the services or exceeds the amount by which the defendant was enriched. *Id.*

### b. *Overhead and Profit*

■ McCarty appeals the district court's failure to award it recovery of general overhead costs and reasonable profit on the job. The court based its refusal on its finding that McCarty failed to prove unjust enrichment. McCarty argues that under quantum meruit it was not required to prove Pullman was enriched by these

---

**1.** The out-of-pocket costs were $3,028,272.00. The court credited Pullman for $2,537,324.08

that it had already paid McCarty. The award was therefore in the amount of $490,947.92.

amounts unless Pullman presented proof otherwise. We agree.

A plaintiff establishes a prima facie right to recover overhead and profit if he proves the amount of overhead allocated to the project and if he establishes what his mark-up or profit margin reasonably should be. The plaintiff's recovery is reduced only if the defendant then proves that the actual costs of overhead were not as claimed, that the claimed profit is unreasonable, or that the total amount claimed by the plaintiff exceeds the enhanced value of the defendant's asset. *See, Houma Armature Works & Supply, Inc. v. Landry,* 417 So.2d 42 (La.App.1982); *Skains v. White,* 391 So.2d 1327 (La.App.1980); *Brummett v. Hamel's Dairy, Inc.,* 324 So.2d 502 (La. App.1975); *Swan v. Beaubouef,* 206 So.2d 315 (La.App.1968).

McCarty presented evidence that its average overhead is 19.3% of direct material and labor costs and that its profit rate is 10%. Using these figures, McCarty is claiming an additional $945,728 in recovery for overhead and profit. These figures were based solely on historical costs and McCarty made no effort to prove what its actual overhead costs on this job were or what profit is reasonable on this particular type of job. The district court made no finding as to whether McCarty presented sufficient evidence to prove its claimed overhead and profit; rather, the court ruled that McCarty could not recover any overhead or profit because McCarty had presented no evidence that Pullman was enriched beyond the amount of McCarty's direct costs. McCarty argues that had the district court correctly allocated the burdens and had Pullman then challenged the amounts claimed, McCarty would have presented additional evidence in support of its claim.

We do not express any view of whether McCarty presented sufficient evidence to prove its claim for overhead and profit. Because the district court applied an incorrect standard of recovery and misallocated the burdens, we remand the case to allow both parties to present additional evidence on the issue of overhead and profit.

*c. Out-Of-Pocket Material and Labor Costs*

Pullman cross-appeals the award of out-of-pocket costs to McCarty. The district court found that McCarty established that its out-of-pocket material and labor costs were $3,028,272.00. The court also found that these costs were "reasonable and represented fair value," and that Pullman was enriched to that extent. Under *Swiftships,* McCarty was therefore entitled to recovery of that amount. Pullman argues that McCarty's out-of-pocket costs were inflated, that Pullman was not enriched to the full extent of the claimed costs, and that McCarty is being allowed double recovery of some of the claimed costs.

Pullman's first argument is that McCarty's costs were inflated because of McCarty's inefficiency. Both parties presented evidence in the district court regarding the efficiency of their work. The district court found that neither party proved with sufficient certainty how efficiently its personnel worked. This finding is not clearly erroneous and the award should not be reduced on the ground of inefficiency.

Pullman next argues that McCarty's out-of-pocket costs were increased because one of McCarty's subcontractors (a scaffold erector) breached its contract and McCarty had to arrange substitute performance. Pullman argues that the cost of a scaffolding subcontract was included in the lump sum part of the contract with McCarty and that Pullman should not be liable for material and labor costs that McCarty incurred because of the breach beyond the amount in the contract. Pullman's argument misconceives the nature of the recovery. McCarty is entitled to the reasonable value of its services. The contract has been annulled and it plays no role in determining the reasonable value of McCarty's services. McCarty presented evidence of the actual material and labor costs it incurred in performing the job.

These costs included the expenses of erecting the scaffolding. Pullman implies that it is somehow being called on to pay twice for the same work. There is no evidence in the record to support that claim. Because of the subcontractor's breach, the scaffolding expenses were higher than originally estimated, but the court found the amount of these expenses to be reasonable. The district court also found that Pullman was enriched by these amounts. Pullman did not meet its burden of proving otherwise. After reviewing the evidence we conclude that the district court's findings are not clearly erroneous.

▮ Finally, Pullman argues that even if the amounts McCarty claimed as its actual direct costs were reasonable and enriched Pullman, award of the full amount would result in granting McCarty double recovery of $143,835.00. McCarty sued the breaching scaffolding subcontractor in state court and received a judgment for $143,835.00. The judgment represented the amount of the actual loss occasioned by McCarty as a result of the breach, and includes compensation for some of the costs that McCarty now claims against Pullman. There is no indication that McCarty reduced its claimed actual costs in this case as a result of the state court judgment. Pullman argues that McCarty should not be allowed to recover these costs twice. McCarty states that it has not received payment on the judgment. McCarty argues that Pullman is liable for the full value of the services and, after Pullman satisfies the judgment in this case, Pullman will be entitled to subrogation to McCarty's rights against the scaffold erector. The district court found as a matter of fact that McCarty received a state court judgment against the scaffold erector in the amount of $143,835.00, but made no findings or conclusions as to why McCarty should be entitled to recover this amount from Pullman. We remand for the district court to make further findings on this issue.

d. *Prejudgment Interest*

▮ The district court awarded interest from the date of judicial demand. A debt owed under quantum meruit does not become due until the amount of the debt is ascertained. The amount is ascertained on the date of judgment. Therefore, legal interest in a suit on quantum meruit is granted only from the date of final judgment. *Succession of Butler,* 294 So.2d 512, 516 (La.1974).

V. CONCLUSION

The district court's findings of fact in support of its conclusion that there was error in the principal cause of the contract between Pullman and McCarty are not clearly erroneous, and the district court did not err in annulling the contract. Accordingly, we affirm that part of the district court's opinion.

We hold that the district court erred in awarding recovery under the theory of unjust enrichment and that recovery is properly had on quantum meruit. Nevertheless, the district court's findings are sufficient to allow us to uphold, in large part, the award of McCarty's out-of-pocket costs of material and labor. We affirm the district court's findings that the amounts claimed and proved by McCarty as out-of-pocket costs are reasonable, represent fair value, and enriched Pullman. We remand, however, for further fact findings on the issue of whether McCarty should be allowed to recover $143,835.00 of these costs from Pullman since McCarty has already received a judgment in that amount against a third party in state court.

We reverse the district court's denial of recovery of amounts claimed as overhead and profit and remand to allow the parties to present further evidence on this issue and for further fact findings by the district court.

We reverse the award of prejudgment interest and, on remand, after resolving the issues of McCarty's prior judgment against the scaffold erector and the recovery of overhead and profit, the court shall enter judgment for the amount of the award and

for interest from the date of the final judgment.