United States Court of Appeals,

Fifth Circuit.

No. 95-31078.

The SOCIETY OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAFAYETTE, INC. and The Diocese of Lake Charles, Inc., Plaintiffs-Appellees,

v.

INTERSTATE FIRE & CASUALTY CO., et al., Defendants,

Interstate Fire and Casualty Co., Defendant-Appellant,

Arthur J. Gallagher & Co., Defendant-Appellant-Appellee,

PACIFIC EMPLOYERS INSURANCE CO., Third Party Plaintiff-Appellee,

v.

LOUISIANA COMPANIES INC., Third Party Defendant-Appellant,

St. Paul Fire and Marine Insurance Co., Appellant.

Oct. 30, 1997.

Appeals from the United States District Court for the Western District of Louisiana.

Before HIGGINBOTHAM, EMILIO M. GARZA and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Fifteen years ago, defendant Arthur J. Gallagher & Co. ("Gallagher"), an insurance broker, presented a proposed insurance coverage plan to The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. and the Diocese of Lake Charles, Inc. ("the Diocese"), under which, it represented, the Diocese would not be liable for any losses above $400,000 each policy year. The Diocese agreed to the plan. Later, the Diocese faced numerous claims from boys who were molested by pedophilic Diocese priests as well as claims from the boys' parents. These claims resulted in

millions of dollars of losses for the first two years of the plan, 1981-82 and 1982-83. Unfortunately for the Diocese, though, there was a gap in the plan's excess coverage that resulted in some $4,500,000 in uninsured losses. The Diocese sued Gallagher to recover this amount, alleging that Gallagher had expressly warranted that the Diocese was fully insured above the $400,000 loss fund each policy year, and had breached a contract with the Diocese to provide full insurance over the loss fund. The district court granted summary judgment for the Diocese against Gallagher for the $4,500,000 plus interest. Gallagher appeals. We determine that the district court correctly granted summary judgment to the Diocese against Gallagher for breach of contract with regard to the first year of the plan, but erred in granting summary judgment for breach of contract with regard to the second year.

Meanwhile, Preferred Risk Insurance Co. ("Preferred Risk") and Pacific Employers Insurance Co. ("PEIC") had settled with two of the molested boys for about $1,532,000. Under its three-year primary policy, Preferred Risk paid $1,000,000 of this amount—its policy had a limit of $500,000 per occurrence (which, in this case, meant per molested boy) for the three years—and PEIC, as the excess carrier, had to pay the rest. However, the Preferred Risk policy was nonstandard. A standard three-year insurance policy would have been annualized and provided a policy limit of $1,500,000 for each boy (i.e., the $500,000 policy limit per occurrence would have been "refreshed" each year)—which would have meant that PEIC would have escaped paying *any* of the $1,532,000 settlement. Not surprisingly,

2

PEIC sued third-party defendant Louisiana Companies, Inc. ("LACOS"), an insurance agent to the Diocese, for $532,000, alleging that LACOS had negligently misrepresented (1) the date of expiration of the Preferred Risk policy, (2) the scope of the coverage of this policy, and (3) that this policy was standard. After a bench trial, the district court agreed with PEIC and granted final judgment to PEIC against LACOS for $532,000 plus interest. LACOS appeals. We find that the district court did not err in granting final judgment for PEIC against LACOS.

Also in its final judgment, the district court equitably subrogated to Gallagher the Diocese's rights against its excess carriers. Defendant Interstate Fire & Casualty Co. ("Interstate"), one of the excess carriers, challenges this ruling on the grounds that Louisiana does not permit equitable subrogation. We agree with Interstate.

In deciding this appeal, we will first examine the Gallagher/Diocese dispute, then the Preferred Risk/PEIC conflict, and lastly Interstate's argument about equitable subrogation.

I

We review a district court's grant of summary judgment *de novo*. *New York Life Ins. Co. v. The Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996). In doing so, we employ the same criteria as the district court, and construe all facts and inferences in the light most favorable to the nonmoving party. *LeJeune v. Shell Oil Co.,* 950 F.2d 267, 268 (5th Cir.1992). Summary judgment is appropriate where the moving party establishes that "there is no

3

genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## II

In late 1980, the Diocese decided to save money by opting for a partial self-insurance plan, rather than a traditional full-coverage plan. It formed a task force to look into this idea. In 1981, Gallagher met with the task force and offered the Diocese the so-called Bishop's Program ("the plan"). Under this plan, the Diocese would establish a loss fund each policy year. If an "occurrence" happened under the plan (i.e., if an event triggered plan coverage), the Diocese would pay up to $100,000 from this fund

4

for the loss resulting from the occurrence.  The Diocese would only have to use money from the fund to pay for occurrence losses. Excess insurance carriers would be responsible for (1) any amounts owed above the $100,000 the Diocese had to pay for each occurrence loss and (2) any amounts owed after the fund was exhausted.  In short, the plan expressly warrants that the Diocese would be fully insured for all losses above the loss fund.[1]

Gallagher and the Diocese agreed to the original plan as proposed, except that they increased the Diocese's "deductible" from $50,000 to $100,000 and the amount of the loss fund from $375,000 to $400,000.

Unfortunately, the plan operated differently than Gallagher had represented at the meeting.  If the Diocese exhausted the

---

[1]Specifically, the plan states that

> [a]t no time will the Bishops be exposing the Diocese to unlimited self-insurance....  If the Loss Fund is exhausted, the Dioceses [sic] becomes fully insured and losses are paid as they would be under a conventional insurance program....  The plan is designed so that no single loss can use up the Loss Fund. The Dioceses would pay only the first $50,000 [changed to $100,000] of each loss, over which there will be full insurance coverage.

The plan also notes:

> Loss Fund—$375,000 [changed to $400,000]

> This fund represents the maximum loss payments the diocese would be exposed to in the coming year.

> Stop Loss —

> No loss in excess of $50,000 [changed to $100,000] (Combined Perils) will be charged to the Loss Fund; therefore, one catastrophe claim could not wipe out the entire fund.

5

$400,000 loss fund, a Lloyd's excess insurance package provided as much as $100,000 of coverage per occurrence, *up to an aggregate of $450,000* (the parties refer to this layer of coverage as "the excess aggregate"). After that, a $5,000,000 Interstate excess policy covered additional losses from occurrences.[2] The Interstate policy, however, did not "drop down" to pick up losses exceeding $100,000 per occurrence once the Lloyd's package had reached its aggregate limit of $450,000. Assume, for example, that the Diocese faced fifty occurrences resulting in losses of $100,000 each. If so, the Diocese would not only pay out the $400,000 in the loss fund, but also $50,000 for the ninth occurrence and $100,000 for each of occurrences ten through fifty (a total of $4,550,000).

The record includes a number of documents indicating that, at the meeting, Gallagher did not inform the Diocese about the excess aggregate or that the Diocese would not be fully insured once the excess aggregate was exhausted. These documents were written by Ben Schull, Gallagher sales representative, to Tom O'Connell, Gallagher sales manager. The documents include the following statements regarding the plan:

M "You have reviewed the initial proposal and have seen that there are multiple references to totally insured once you have exceed the loss fund, and you have also seen that there is no mention of any excess aggregate."

M "All parties stated that they voted for the bishop's program because there was total insurance after the loss fund was exceeded."

M "[The Dioceses'] understanding was that as soon as they exceeded

---

[2]There were also other layers, but they are not relevant in this case.

the loss fund, they were totally insured."

M "The only mention of the $450,000 excess aggregate is on the premium page and is unintelligible to the unknowing client. Our worst fears are realized:

1. The original program was oversold in the written proposal and in verbal presentation."

M "How do we respond to the fully insured misrepresentation?"[3]

Besides these documents, there was also relevant deposition testimony regarding the plan. The members of the Diocese task force all testified that, at the time the Diocese entered into the plan, they believed that the Diocese would be fully insured under the plan after the exhaustion of the loss fund. Moreover, James Helouin, who worked for a Gallagher affiliate and who accompanied Gerald Lillis (Schull's predecessor as sales representative) to the meeting at which Lillis explained the plan, testified that he left the meeting with the same impression. The task members and Helouin also testified that they did not remember any mention of a $450,000 excess aggregate at the meeting. Even Lillis conceded in his deposition that he could not remember whether he referred to any

---

[3]These statements are (1) offered against a party and (2) are by the party's agents or servants concerning a matter within the scope of the agency or employment and made during the existence of the relationship. Thus, the statements are nonhearsay, and admissible against Gallagher under Rule 801(d)(2) of the Federal Rules of Evidence.

In determining the statements' admissibility, the fact that Schull may have had no "personal knowledge" of the actual negotiations over the contract or its final execution is irrelevant. See State Farm Mut. Auto. Ins. Co. v. Porter, 186 F.2d 834, 842 (9th Cir.1951) ("The rule is that personal knowledge of the person making an admission is immaterial."); 4 JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE, § 1053, at 16 (noting that personal knowledge is not required for admissions).

7

excess aggregate.  Certainly, there is nothing in the written plan itself regarding such an aggregate.

According to Gallagher's written proposal, the plan was to have a three-year term, with adjustments for the second and third annual periods to premiums, the service fee, and the loss fund. After the parties had agreed to the plan and about two months before it became effective on September 1, 1981, Lillis brought James R. Oliver, one of the task force members, binders providing details about the various insurance policies underlying the plan. Shortly after he received the binders, Oliver forwarded copies of them to another task force member, Harry Wagner.  The binders make an oblique reference to the excess aggregate.  One sheet, for instance, notes the following after the words "Amount or Limit":

$400,000 Each and Every Loss and/or Occurrence

$450,000 In the Aggregate annually in respect of the Assured's Retention.

EXCESS OF:

$100,000 Each and Every Loss and/or Occurrence

$400,000 In the Aggregare [sic] annually in respect of the Assured's Retention.

This sheet is dated June 22, 1981 and states that the insurance policy runs from July 1, 1981 to October 1, 1982.

During the first six months of the plan, the Diocese suffered from a rash of mysterious arson fires.  Lillis and O'Connell testified that they spoke to two task force members, Harry Benefiel and H.A. Larroque, about how liability from the fires might exhaust the loss fund and about how the Diocese might need a second layer

8

of excess aggregate insurance. Lillis and certain task force members also stated that the Diocese was concerned that its insurers might not renew the plan policies on July 1, 1982. In addition, Wagner testified that around the time of the fires, he realized that the Diocese might face insurance liability exceeding the amount of the loss fund. Apparently, as a result of these concerns, in March 1982 the Diocese agreed to create a separate loss fund of $200,000 (in addition to the existing $400,000 loss fund) and also made an additional premium payment. The additional $200,000 loss fund remained in effect from April 1, 1982 to July 1, 1982. Confirming this change, Gallagher executed an endorsement, dated August 19, 1982 and effective April 1, 1982, which reads that "[i]t is hereby noted and agreed that the aggregate sum insured hereon in respect of the first period of insurance, from July 1, 1981 to July 1, 1982, is amended...." The endorsement then refers to an excess aggregate of $400,000 and notes the creation of the $200,000 loss fund. The endorsement also states that "ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED."

Sometime before July 1, 1982 (the one-year anniversary date of the effective date of the plan), Gallagher presented the Diocese with a renewal proposal. This renewal proposal differed from the original plan in two main ways. First, unlike the original proposal, the renewal proposal was not accompanied with written explanatory material assuring the Diocese that it was "fully insured" over the loss fund. Second, the renewal proposal mentioned the excess aggregate, though it did not illustrate how

9

the excess aggregate worked. The proposal simply noted: "Lloyd's—Excess Package ... $450,000 Aggregate excess Loss Fund." While the renewal proposal suggested a $400,000 loss fund, just like the contract covering the first year of the plan, the parties ended up agreeing to a $475,000 loss fund; however, the parties also retained a $450,000 excess aggregate. Gallagher then executed an endorsement, dated August 19, 1982 and effective July 1, 1982, noting that the parties agreed to these amounts and that "ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED."

Around July 26, 1982, Lillis sent a letter to Benefiel explaining how the $450,000 excess aggregate affected the two loss funds that existed from April 1, 1982 to July 1, 1982. As Lillis stated, "The Lloyd's of London policy provides a $450,000 aggregate limit that will apply over these two loss funds. To clarify, this aggregate limit applies up to $450,000 in total and does not apply separately and distinctly to each of the loss funds. Any residual over the first nine month period of the $450,000 aggregate limit would apply to the second fund." However, Lillis did not attempt to show how the Lloyd's excess aggregate interacted with the Interstate excess policy.

Before July 1, 1983, Gallagher gave the Diocese a renewal proposal similar to that of the previous year. This proposal suggested a $400,000 loss fund and $450,000 excess aggregate. The successor to Gallagher then executed an endorsement, dated July 19, 1983 and effective July 1, 1983, noting that the parties agreed to a loss fund of $475,000 and an excess aggregate of $450,000. Also,

10

"all other terms and conditions remain unchanged."

Before July 1, 1984, Gallagher furnished the Diocese with a renewal proposal that, for the first time, actually explained how the excess aggregate worked and explicitly stated that the Diocese was not fully insured above the loss fund. The renewal proposal, under the subheading "operation of the plan," declares that "IF THE [LOSS] FUND IS EXHAUSTED, THE DIOCESAN [SIC] BECOMES FULLY INSURED UP TO THE LEVEL OF THE EXCESS AGGREGATE COVERAGE SELECTED." The renewal proposal then notes that "[i]n the event the loss fund amount of $550,000 is exhausted, the London Package policy provides an additional limit of $450,000 to pay losses up to the $100,000 stop-loss limit. If this aggregate loss fund protection limit is exhausted, then the diocese would be required to pay losses up to $100,000 for each occurrence thereafter."

While the plan extended through 1984, only the first two years of the plan, 1981-82 and 1982-83, are at issue in this appeal. During these two years, there were dozens and dozens of occurrences of molestation of boys. After various molested boys and their parents began filing suits in 1984 against the Diocese, payments to these individuals quickly exhausted the Diocese's $400,000 loss fund, the $200,000 loss fund, and the Lloyd's package aggregate of $450,000. A portion of the $5,000,000 Interstate coverage was also used. However, at least forty-five occurrence losses fell in the gap between the Lloyd's package aggregate and the Interstate policy (i.e., arose in the first year after the $400,000 loss fund had been exhausted and $450,000 excess aggregate had been reached or

11

arose in the second year after the $600,000 loss funds had been exhausted and the $450,000 excess aggregate had been reached); this amounted to about $4,500,000 of uninsured losses.  Obviously, the Diocese had *not* been fully insured for all losses above the loss fund.

A

The Diocese argues that the law of the case bars Gallagher from arguing that Gallagher did not expressly warrant that the Diocese was fully insured.  Specifically, the Diocese points to this court's previous decision in this matter in *The Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Casualty Co.,* 26 F.3d 1359 (5th Cir.1994) ("*Society I* ").  In that opinion, we ruled that:

> The Diocese argues that Gallagher warranted a specific result when it told the Diocese:  "If the [Loss] Fund is exhausted, the Diocese[ ] becomes fully insured."  Following [the] lead [of *Roger v. Dufrene,* 613 So.2d 947 (La.1993) ], the issue is whether Gallagher specifically warranted the amount of the Diocese's coverage, and we conclude that it did.  Indeed, we find it difficult to see how Gallagher could have been more specific.  The Diocese's claim is contractual because Gallagher specifically stated that the loss fund capped the Diocese's potential yearly exposure, which it certainly did not.

*Society I,* 26 F.3d at 1367.

The law of the case doctrine was developed to "maintain consistency and avoid [needless] reconsideration of matters once decided during the course of a single lawsuit."  *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.,* 3 F.3d 877, 881 (5th Cir.1993) (citation omitted), *cert. denied,* 511 U.S. 1032, 114 S.Ct. 1541, 128 L.Ed.2d 193 (1994).  Under this doctrine, we will follow one of

our prior decisions without reexamination in a subsequent appeal unless the evidence in a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work manifest injustice. *Id.*

The language in the *Society I* opinion quoted above is somewhat imprecise. First, the issue of whether the Diocese's claim against Gallagher is contractual or delictual is a largely factual one—it hinges on a question of fact: did the insured's agent or broker expressly warrant a specific result? *Roger*, 613 So.2d at 949. The Diocese was appealing the district court's grant of summary judgment to Gallagher. Thus, what the panel really meant in the text quoted above was that there was a genuine dispute of material fact over whether the Diocese's claim is contractual; and, so, the panel simply held that the Diocese's claim was *not delictual* as a matter of law and thus the district court wrongly granted Gallagher summary judgment (and this is the most the panel *could* have held). To that extent the panel's statement was pure dicta. Gallagher pointed out in a motion for rehearing to the panel that the language quoted above could be erroneously interpreted as a factual finding, but, alas, the panel did not alter its opinion. However, the fact that the panel did not correct the quoted language does not mean that dicta somehow becomes the law of the case.

Significantly, after the *Society I* panel remanded the case, the district court granted the Diocese summary judgment on the basis that the Diocese's claim against Gallagher was *contractual.*

13

This time around, the summary judgment burden was on the Diocese, rather than Gallagher. Moreover, the district court considered additional evidence in granting the Diocese summary judgment, evidence that it did not have the opportunity to consider when it erroneously granted Gallagher summary judgment on the same issue. The Diocese even emphasizes this point in its brief: "On remand, the trial court was presented with even stronger evidence than before on the issue of Gallagher's liability."

This court will not apply the law of the case to factual determinations if there is a different standard of review in the two appeals. *See Royal,* 3 F.3d at 881 (holding that "[b]ecause the standard of review for factual determinations on direct appeal is higher than the standard applied during an interlocutory appeal of a preliminary injunction, the interlocutory appeal normally will not establish law of the case on factual matters"). This court has also held that the law of the case does not apply where the first appellate ruling transpired before the parties had the opportunity to present all their evidence to the district court. *See Enlow v. Tishomingo County, Mississippi,* 45 F.3d 885, 888 n. 8 (5th Cir.1995) (holding that, under law of the case, appellate decision that material factual issues precluded summary judgment on plaintiff's claims did not preclude district court from later granting defendants' motion for a directed verdict because, by then, the parties had presented all of their evidence).

Given this authority, the law of the case would not apply here. There is a different standard of review in *Society I* and

14

this appeal.  In *Society I,* the summary judgment burden was on Gallagher;  this court, for instance, construed the facts in favor of the Diocese.  Now, in this appeal, the summary judgment burden is on the Diocese.  Moreover, the parties presented additional evidence in the district court after *Society I.* Thus, now, there is a different record on appeal.

Therefore, the law of the case does not bar Gallagher from contending that there is a triable issue over whether it expressly warranted that the Diocese was fully insured.  Accordingly, we will next consider Gallagher's argument to that effect.

B

Gallagher maintains that there is a genuine dispute of material fact over whether it expressly warranted that the Diocese would be fully insured for all losses above the loss fund.  If it is correct, a jury question exists whether the Diocese's claim is contractual or delictual.  If the claim is contractual, then the Diocese had a ten-year prescriptive period in which to file its action.  If the claim is delictual, it had a one-year prescriptive period.  The Diocese filed this action several years after it knew or should have known of Gallagher's alleged negligent acts, that is, several years after the one-year prescriptive period began to run.

Gallagher first asserts that there can only be an express warranty if there is a contract.  In this regard, it contends that there is material evidence that the plan was not a contract and that the Diocese knew of the excess aggregate limit before the

15

second year of the plan. Second, Gallagher avers that a vice of consent prevented the plan from becoming a contract.

Clearly, there can only be an express warranty for purpose of determining whether the Diocese's claim is contractual if that express warranty was part of some sort of contract. *See Harrison v. Gore,* 660 So.2d 563, 568 (La.App.) (suggesting that, under *Roger,* the ten-year prescriptive period applies only if the plaintiff's claim is grounded in "a special obligation contractually assumed by the obligor"), *writ denied,* 664 So.2d 426 (La.1995). In other words, at a minimum, there must be no genuine dispute of material fact that there was a contract that contained the express warranty. At the time of the events in dispute, a contract was an agreement, in which one person obligates himself to another, to give, to do or permit, or not to do something, express or implied by the agreement.[4] *Julius Cohen Jeweler, Inc. v. Succession Jumonville,* 506 So.2d 535, 538 (La.App.) (applying pre-1984 law), *writ denied,* 511 So.2d 1155 (La.1987). The Civil Code required four elements for a valid contract: (1) the parties must have the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. *Id.* Gallagher contends that triable issues exist on the second and third elements here—the existence of consent and a certain object.

---

[4]The Civil Code articles dealing with obligations were extensively revised in 1984. The articles in effect before the 1984 revisions apply here. We will apply them throughout this opinion.

16

In response, the Diocese generally cites *Roger* and claims that there was a unilateral or gratuitous contract.

The Diocese's reply is totally inadequate. For one thing, there was no unilateral contract. Obviously, if the Diocese consented to the plan, it would be obligated to pay premiums/commissions in return for brokerage services. In other words, assuming there was a contract, it imposed obligations on *both* the Diocese and Gallagher. Therefore, any contract would be synallagmatic. *Bullock v. Louisiana Indus.,* 370 So.2d 148, 149 (La.App.1979); *Kaplan v. Whitworth,* 116 La. 337, 40 So. 723, 724 (1905). The Diocese is also wrong to say that the alleged contract was gratuitous. Gallagher was demanding a price for its services (i.e., premiums/commissions). So, the contract cannot be gratuitous. *Armour v. Shongaloo Lodge No. 352, Free and Accepted Masons,* 330 So.2d 341, 345 (La.App.1976), *judgment rev'd for other reasons,* 342 So.2d 600 (La.1977).

The gist of Gallagher's argument here is that the document containing the "fully insured" language was just a proposal, that some terms were changed during negotiations, and that the parties never actually entered into a contract (or, if they did enter a contract, it is unclear what that contract really included). However, there is much evidence that, except for slight alterations in the dollar amounts, the proposal was Gallagher's offer and the Diocese agreed to it; there is really no material proof to the contrary. To win a reversal on this point, Gallagher must demonstrate a jury question on the following: that sometime after

17

Gallagher presented the plan to the Diocese and before the Diocese agreed to it (with a few changes in dollar amounts), Gallagher withdrew its representation that the Diocese was fully insured. But Gallagher cannot. The record plainly indicates that both Gallagher and the Diocese consented to the plan (with the dollar changes) and that there was a certain object to the plan (i.e., the provision of full insurance coverage above the loss fund). Therefore, the Diocese and Gallagher had a valid contract, and Gallagher expressly warranted a specific result. Accordingly, the Diocese's claims against Gallagher, at least with regard to the first year of the plan, are contractual and thus timely filed.

Next, Gallagher contends in the alternative that, even if it expressly warranted that the Diocese would be fully insured for the first year of the plan, it specifically explained the $450,000 aggregate limit to the Diocese before the beginning of the second year of the plan, and the Diocese chose not to purchase additional coverage. The contract between the Diocese and Gallagher was for a three-year term and provided for adjustments to premiums, the service fee, and the loss fund for the second and third annual periods. The "renewal proposals" Gallagher provided to the Diocese for the second year presented such adjustments. In agreeing to a change in terms, parties may intend to make a new and separate contract rather than modify an existing contract. *See Ketteringham v. Eureka Homestead Soc.,* 140 La. 176, 72 So. 916, 917 (1916). However, we do not see the changes made pursuant to the renewal proposals as creating new contracts. The summary judgment record

18

does not present evidence that there were three separate one-year contracts, and Gallagher does not argue that in its brief. Therefore, Gallagher must demonstrate that it and the Diocese modified their contract to discharge Gallagher from the warranty.[5]

Under Louisiana law, contracts may be modified only by mutual consent of the parties to the contract. *See Williams Eng'g, Inc. v. Goodyear,* 480 So.2d 772, 778 (La.Ct.App.1985), *aff'd,* 496 So.2d 1012 (La.1986). In order to constitute a valid modification, an agreement must be clearly defined, and the party sought to be held to the modification must have in fact actually agreed to and authorized the modification. *See Cardos v. Cristadoro,* 228 La. 975, 84 So.2d 606, 610 (1955) (holding that there was no evidence that parties actually agreed to modify stock purchase agreement and thus contract was effective as originally written); *see also Wise v. Lapworth,* 614 So.2d 728, 731 (La.Ct.App.1993) (holding that subsequent modifications to a written proposal, which constituted a contract upon oral acceptance, were not part of the contract because they were done without the knowledge or consent of other

---

[5]Nine months into the first year of the plan, the Diocese and Gallagher modified the contract by agreeing that the Diocese would establish an additional loss fund of $200,000 and pay an extra premium. However, we do not see the parties' modification here as a new contract. As Gallagher stated in its endorsement, the parties here merely agreed to "amend[ ]" the "aggregate sum agreed hereon in respect of the first period of insurance, from July 1, 1981 to July 1, 1982." Because this amendment did not create a new contract, it did not discharge Gallagher's original express warranty. *See Ketteringham v. Eureka Homestead Soc'y (In re Salzer* ), 140 La. 176, 72 So. 916 (1916) (holding that parties, who agreed to substitute a hot-water heating system for the hot-air system stipulated in contract, did not make a new contract but only amended the existing contract).

19

party). Modifications may, however, be effected by implication, silence, or inaction. *See, e.g., W.R. Aldrich & Co. v. Spalitta,* 285 So.2d 835, 836-37 (La.Ct.App.1973) (holding that although person who hired an excavating company did not expressly consent to a modification in the cost of the contract, he did consent by implication when he asked for location of excavation to be changed, was advised that the cost would be greater, and made no objection). A modification will, however, not be effected when there is no meeting of the minds regarding the modification, such as when the parties did not discuss or agree to the change. *See Williams Eng'g,* 480 So.2d at 776 (holding that because there was no discussion or agreement regarding change in engineer's method of providing cost estimates to company that hired him, there was no meeting of the minds and thus no modification as to how the engineer should provide cost estimates).

The issue, then, becomes whether the Diocese consented, either expressly or impliedly, to the discharge of Gallagher's warranty that the Diocese was fully insured. On the one hand, members of the Diocese task force generally testified that they believed until 1984 that the Diocese was fully insured over the loss fund. Also, the record indicates that Gallagher did not fully illustrate how the excess aggregate operated in any of its proposals until 1984. On the other hand, some evidence exists that Gallagher alluded to and even explained the excess aggregate to members of the task force before the parties entered into the 1982-83 plan year. For instance, the plan binders and first renewal proposal mentioned the

20

excess aggregate.  Also, Wagner testified that he knew during the first year of the plan that the Diocese might face insurance liability over the amount of the loss fund.  Finally, Lillis and O'Connell testified that they spoke to two task force members around the time of the arson fires about how the Diocese might need another layer of excess aggregate insurance.  Thus, a genuine dispute of material fact exists as to whether the Diocese impliedly consented to discharge Gallagher's warranty by continuing the program in the second year knowing the risk of inadequate coverage.  Consequently, a genuine dispute of material fact exists as to whether the Diocese's claims arising out of the second year of the plan are delictual, and thus time barred.

Gallagher also argues that a "vice of consent" exists that precludes the formation of a contract under Louisiana law, and that the contract must be annulled because of unilateral error.  Gallagher claims that the Diocese knew that it would be liable for pedophilic acts by its priests and failed to inform Gallagher of this before entering into the plan.  Gallagher also suggests that the Diocese breached its duty under agency law by failing to disclose that it knew some of its priests had molested boys.

To show vice of consent on the basis of unilateral error, Gallagher must show that (1) the Diocese made misrepresentations, (2) Gallagher justifiably relied on these misrepresentations, (3) the error bears upon the principal cause of the contract, and (4) the Diocese knew or should have known that its misrepresentations would be relied upon.  *McCarty Corp. v. Pullman-Kellogg, Div. of*

21

*Pullman, Inc.,* 751 F.2d 750, 755 (5th Cir.1985).

Gallagher has gathered evidence that, before the Diocese entered into the plan, Larroque and Bishop Gerald L. Frey knew about incidents of priestly pedophilia. There is at least a triable issue that the Diocese made material omissions.

The biggest obstacle here for Gallagher, though, is the principal cause element. With regard to errors of fact, article 1823 provides that "a principal cause for making the contract ... may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself." There is no alleged unilateral error here with regard to the subject matter of the plan; both the Diocese and Gallagher knew what the plan principally covered. True, the Diocese did not specifically know about the excess aggregate before entering into the 1981-82 plan year. However, even if the excess aggregate was a principal cause of the making of the contract, there is no indication that the Diocese knew or should have known about it; the record indicates that Gallagher did not provide any information to the Diocese about the excess aggregate until after the parties entered into the 1981-82 plan year and that Gallagher had in fact expressly warranted that the Diocese was fully insured over the loss fund. Hence, the contract cannot be annulled. *See Carpenter v. Christian,* 496 So.2d 1364, 1368 (La.App.1986) (ruling that "a contract may be invalidated for unilateral error as to a fact which was the principal cause for making the contract only when the other party knew or should have known it was the principal

22

cause").

The only issue left regarding the principal cause element, then, is motive, that is, whether the Diocese entered into the plan for the purpose of having Gallagher cover some of its expected losses from claims arising from pedophilic Diocese priests. *See Savoie v. Bills,* 317 So.2d 249, 255 (La.App.) (finding that "defendants knew that these errors were the principal cause for the signing of the contract by the two landowners. The misrepresentations ... were for the very purpose of securing the signatures."), *writ dismissed,* 320 So.2d 554 (1975). There is absolutely no evidence of such a motive; in fact, Gallagher's argument here is implausible. If the Diocese really intended to avoid large losses that it expected from pedophilia claims it would hardly have tried to pass these losses along to Gallagher—its *insurance agent.* Instead, it would have tried to slough the losses off on some insurer. Moreover, the Diocese would not have entered an insurance coverage plan that contained a large coverage gap, such as the one at issue here. Rather, it would have entered into a conventional insurance scheme, one that ensured that the insurance companies would pay the maximum amount of the anticipated liability tab. There is certainly no *genuine* dispute of material fact on whether the Diocese entered into the plan with the primary purpose of making Gallagher pay for uninsured losses.

Lastly, Gallagher makes an agency argument. It contends that it was the agent of the Diocese, and the Diocese had the duty to inform it of the risk of pecuniary loss that existed in the

23

performance of its duties in brokering the plan. Gallagher avers that the Diocese breached its fiduciary duty by failing to inform it that Gallagher might be liable to cover certain losses incurred from the activities of pedophilic priests. This breach, Gallagher claims, precludes the Diocese from relying on the express warranty to argue that Gallagher is liable for the Diocese's uninsured losses.

Gallagher is correct that it was the agent of the Diocese. *See Motors Ins. Co. v. Bud's Boat Rental, Inc.,* 917 F.2d 199, 204 (5th Cir.1990) (noting that under Louisiana law, an insurance broker is generally deemed to be the agent of the insured rather than the insurer); *Tassin v. Golden Rule Ins. Co.,* 649 So.2d 1050, 1054 (La.App.1994) (holding that insurance broker is generally agent of insured). Its agency argument fails, though—at least with regard to the first year of the plan. The Diocese had no duty to provide Gallagher with any information about possible future losses either when the parties entered the plan or during the plan's initial year. First, at the time the Diocese agreed to the plan, it reasonably believed (given Gallagher's express warranty) that the plan would cover all losses over the loss fund. Hence, even assuming that a task force member knew before 1981 that the Diocese might face losses resulting from priestly molestations, this person would have thought that the insurance companies underwriting the plan—not Gallagher—would cover the losses. Second, during the first year of the plan, Gallagher was contractually bound to ensure that the Diocese remained fully insured over the loss fund. This

24

contractual obligation would have stayed unchanged even if the Diocese had learned about the excess aggregate during this period and told Gallagher that it might be liable for the Diocese's uninsured losses. Hence, the Diocese had no duty during the first year of the plan to share any information it had with Gallagher about pedophilic priests.

In addition, even if the Diocese did have a duty to inform Gallagher about possible future losses and breached that duty during the first year of the plan, this would not be grounds for preventing the Diocese from relying on the express warranty. Absent an explicit agreement to the contrary, a principal has no duty to indemnify an agent for losses incurred due to the agent's fault. *Shair-A-Plane v. Harrison,* 291 Minn. 500, 189 N.W.2d 25, 27-28 (1971) (citing RESTATEMENT (SECOND) OF AGENCY §§ 438 & 440(a) and accompanying cmts.). Here, Gallagher's liability to the Diocese stems from the fact that Gallagher made an express warranty that was flatly incorrect. Refusing to recognize that liability would force the Diocese to indemnify Gallagher for losses that resulted from Gallagher's own error. Therefore, the Diocese is not barred from using the express warranty to hold Gallagher responsible for the Diocese's uninsured losses during the first year of the plan.

Accordingly, we determine that, with regard to the first year of plan coverage, there is no genuine dispute of material fact over whether Gallagher expressly warranted that the Diocese would be fully insured for all losses above the loss fund. However, with regard to the second year of plan coverage, we conclude that a

genuine dispute of material fact exists over whether Gallagher made such an express warranty.

C

Gallagher maintains that a triable issue exists on whether it breached a contract with the Diocese. As demonstrated above, Gallagher and the Diocese had a contract, and as part of that contract, Gallagher expressly warranted that the Diocese was fully insured above its loss fund. It is undisputed that the Diocese was not fully insured above its loss fund. Hence, no jury question exists over whether Gallagher breached this contract with the Diocese for the first year.

D

Gallagher contends that the parties did not reasonably contemplate as a matter of law that Gallagher (as opposed to the insurance companies providing the Diocese with coverage) would be liable for damages arising from child molestation by pedophilic Diocese priests.

Absent fraud or bad faith, a party in breach of contract is "liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." L.S.A.-C.C. art.1934(1). At the time they entered into the plan, the parties reasonably contemplated that Gallagher would be liable for damages that arose if, contrary to Gallagher's express warranty, the Diocese was not fully insured above its loss fund. Therefore, Gallagher's contention here has no merit.

26

E

Gallagher asserts that a genuine dispute of material fact exists on whether its express warranty caused the Diocese damages. First, it avers that the district court did not determine how the insurance policies interrelated. However, the interrelation of the insurance policies is clear from the record. As discussed earlier, from the Diocese's perspective, the primary problem with the plan was that the Interstate policy did not "drop down" to pick up losses exceeding $100,000 per occurrence once the Lloyd's excess package had reached its aggregate limit of $450,000. This resulted in some $4,500,000 in uncovered losses. Obviously, if the Diocese was fully insured beyond the loss fund, which Gallagher had expressly warranted, it would not have incurred these losses. Hence, the Diocese is entitled to compensatory damages of about $4,500,000. As the breaching party, Gallagher must put the Diocese in as good a position as it would have been had Gallagher fulfilled its express warranty.

Second, Gallagher claims that there is a jury issue on whether the Diocese committed criminal acts, which would be excluded from coverage. Apparently, Gallagher maintains that various Diocese officials violated § 14:403 of the Louisiana Statutes and thus committed the misdemeanor of failing to report child abuse. However, it is only a crime in Louisiana for *certain persons* to fail to report child abuse; the Diocese officials here are not such persons. La. Stat. § 14:403; L.S.A.-Ch. C. art. 609. Gallagher also suggests that Diocese officials aided and abetted

27

child molestation.  There is no evidence of this.

In conclusion, Gallagher has failed to show a genuine dispute of material fact on the express warranty issue with regard to the first year of the plan.  No rational jury could find for Gallagher on the express warranty issue.  *BMG Music v. Martinez,* 74 F.3d 87, 91 (5th Cir.1996).  However, Gallagher has succeeded in demonstrating a triable issue over whether it made an express warranty with regard to the second year of the plan.[6]

## III

The issue raised on appeal by LACOS arises out of lawsuits by two children molested by a pedophilic priest in the Diocese.  One child's suit was settled for about $900,000 and the other child's suit for about $632,000.

Preferred Risk provided the primary insurance for the Diocese from July 1978 to July 1981 through a three-year policy with a limit of $500,000.  This policy did not contain an annualization clause, that is, it provided a policy limit of $500,000 for the three years *together* rather than a policy limit of $500,000 for *each* of the three years.  In other words, the policy suggested that Preferred Risk only offered $500,000 of coverage, not $1,500,000.

Houston General Insurance Co. ("Houston") and PEIC provided excess coverage for the Diocese.  Houston furnished a one-year

---

[6]Gallagher also claims that there is a triable issue on whether the Diocese's losses would have been covered by a "conventional" insurance plan (i.e., whether, but for entering the flawed Bishop's Program, the Diocese would have sustained damages).  This cause-in-fact argument, though, is inappropriate for a breach of contract action.  Hence, we do not discuss it.

28

excess policy from July 1978 to July 1979, and PEIC provided a one-year excess policy from July 1979 to July 1980 and a one-year excess policy from July 1980 to July 1981.

To obtain excess coverage from PEIC during the 1979-80 and 1980-81 periods, LACOS mailed applications to an agent of PEIC. These applications allegedly contain materially false information. First, the 1979-80 application states that the Preferred Risk policy period runs from July 1, 1979 to July 1, 1980 and that the policy provides $500,000 of coverage per occurrence. In turn, the 1980-81 application states that the Preferred Risk policy period runs from July 1, 1980 to July 1, 1981 and that the policy provides $500,000 of coverage per occurrence. However, as this court ruled in *Society I,* the Preferred Risk policy only furnished a *total* of $500,000 of coverage for the period from July 1, 1978 to July 1, 1981. Second, the statement in the 1979-80 application that the Preferred Risk policy expired on July 1, 1980 was false—the policy in fact did not expire until July 1, 1981. Third, each application states that the Preferred Risk policy does not "afford coverage less than standard in any respect." However, the district court found that the insurance industry at the time the applications were sent regarded three-year policies that were not annualized as "nonstandard."

In *Society I,* this court adopted an "exposure rule" to allocate losses stemming from the molestations. This rule defined what an "occurrence" would be under the insurance policies. We held that there was an occurrence when a child was first molested

29

during a policy period, and that all subsequent molestations of a particular child during the policy period, as well as any resulting injury to the child's parents, arose out of the same occurrence. We also ruled that a loss due to an occurrence would be allocated among the insurers according to the percentage of the time or period that each occurrence happened during an insurer's policy period.

Under this rule, Preferred Risk had to contribute $500,000 for each of the two settlements. PEIC then had to pay the remaining $532,000. Obviously, if the policy limit for each occurrence under the Preferred Risk was $1,500,000, rather than $500,000, then PEIC would have had to pay nothing.

PEIC then sued LACOS to recover the $532,000. It alleged that LACOS was liable for negligent misrepresentation. Specifically, it asserted (1) that LACOS had failed to disclose that its primary policy was for three years, rather than one; (2) that LACOS misrepresented that the primary policy had policy limits of $500,000 for each year; and (3) that LACOS failed to disclose that the primary policy was "substandard" in that it did not have an annualization clause.

PEIC and LACOS submitted this issue to the district court for a bench trial. The district court relied entirely on trial briefs, depositions, and documentary evidence. The district court determined that a legal duty exists between LACOS and PEIC because "[c]ommon sense dictates that the excess carrier or its agent must know the material details of the underlying policy." The district

court then found that LACOS breached this duty by "misstating the expiration of the policy and by misrepresenting the scope of the underlying coverage." The court also appears to have implicitly found that LACOS misrepresented the coverage as standard when it was in fact substandard. Finally, the district court ruled that PEIC had suffered damages because, if the Preferred Risk policy provided annualized coverage, as LACOS had suggested, then PEIC would not have had to pay $532,000.

LACOS alleges that the district court erred in finding that it had negligently misrepresented the terms of the policy. A person commits the tort of negligent misrepresentation when (1) he has a legal duty to supply correct information; (2) he breaches that duty; and (3) his breach causes damages to the plaintiff. *Barrie v. V.P. Exterminators, Inc.,* 625 So.2d 1007 (La.1993); L.S.A.-C.C. arts. 2315 & 2216. This tort applies in both nondisclosure and misinformation cases. *Nesbitt v. Dunn,* 672 So.2d 226, 231 (La.App.1996).

LACOS avers that all three of these elements are lacking. First, LACOS asserts that it had no "duty to read the Preferred Risk Policy and identify the lack of "annualization' language therein." Second, LACOS concedes that it misstated the expiration of the policy, but asserts that this was not a *material* misrepresentation. Similarly, it avers that, at the time of the policies in question, the insurance industry treated three-year policies as one-year policies. Therefore, LACOS asserts that it did not breach any duty to PEIC. Third, it claims that PEIC would

31

have written the excess coverage even in the absence of LACOS' alleged misrepresentations and omissions, and thus it was not the cause in fact of PEIC's damages.

We disagree with LACOS' first contention. LACOS clearly had a legal duty to provide correct information to the Diocese. It was the Diocese's insurance agent.

LACOS makes two arguments why it did not breach any duty it had to the Diocese. First, LACOS alleges that it was industry practice in the late 1970s and early 1980s to annualize three-year insurance policies and that this was what Preferred Risk did to its policy. Thus, LACOS avers that it did not make any misrepresentations. There was much testimony in the district court on industry practice at the time the policies were written. There was no dispute that three-year insurance policies were generally annualized. The only dispute was over whether three-year insurance policies that lacked an annualization clause would typically be annualized. The district court sided with the Diocese's expert on this point. It believed that the most credible explanation of industry practice was that three-year policies with annualization clauses would be annualized, and three-year policies without such clauses would not; otherwise, it reasoned, there was no reason to have annualization clauses at all. We agree with the district court's logic. Certainly, it is not clearly erroneous. Since the Preferred Risk policy lacked an annualization clause, then, LACOS negligently misrepresented that the Preferred Risk policy was standard.

32

Second, LACOS claims that this court's adoption of the "exposure rule" in *Society I* was a "watershed" decision that created new law. Under the exposure rule, a three-year policy that is not annualized provides less coverage in a situation where children are repeatedly molested over several years than three one-year policies (or a three-year policy that is annualized). LACOS suggests that the claims it made to the Diocese about the Preferred Risk policy predate *Society I,* and thus were not misrepresentations at the time they were made. This contention is a red herring. If industry practice was to include annualization clauses in three-year policies, then LACOS breached its duty by representing that the Preferred Risk policies were standard. The "exposure rule" is irrelevant here.

In addition, we determine that LACOS was the cause in fact of PEIC's damages. There was evidence that LACOS misled PEIC into thinking that the Preferred Risk policy was not annualized. There was also proof that PEIC would not have provided excess coverage if it had known that the Preferred Risk policy was not annualized. Therefore, PEIC would not have suffered injury if LACOS had not negligently misrepresented the terms of the policy.

In conclusion, PEIC has demonstrated that LACOS negligently misrepresented the Preferred Risk policy. Thus, the district court did not err in granting final judgment to PEIC for $532,000.

IV

In its final judgment, the district court ruled that "[t]he Diocese hereby expressly subrogates to ... Gallagher its rights

33

against the Diocese's excess carriers or other debtors."

Interstate alleges that the district court erred in including the language quoted directly above. Interstate did not raise this issue below. Thus, we review for plain error. *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1422 (5th Cir.1996).

Gallagher did not make a claim for subrogation in the district court. Apparently, the district court added the subrogation language at the Diocese's invitation. In any event, though, the common-law theory of equitable subrogation does not exist in Louisiana. *Institute of London Underwriters v. First Horizon Ins. Co.,* 972 F.2d 125, 127 (5th Cir.1992). Louisiana law recognizes only conventional subrogation (i.e., subrogation by contract) and legal subrogation (i.e., subrogation specifically recognized by the Civil Code). *Id.* Under the Civil Code, legal subrogation takes place in five instances:

> (1) In favor of an obligee who pays another obligee whose right is preferred to his because of a privilege, pledge, or mortgage;
>
> (2) In favor of a purchaser of movable or immovable property who uses the purchase money to pay creditors holding any privilege, pledge, or mortgage on the property;
>
> (3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment;
>
> (4) In favor of an heir with benefit of inventory who pays debts of the estate with his own funds;
>
> (5) In the other cases provided by law.

L.S.A.-C.C. art. 1829. Comment (e) to article 1829 explains what the "other cases provided by law" are. These other cases—all of which are in the Louisiana statutes—include subrogation of a

34

state-supported charity hospital to the rights of a patient, subrogation of an employer or insurer who pays an employee workmen's compensation to the rights of that employee against a third person under the Workmen's Compensation Act, and subrogation of a taxpayer to the right of the collecting authorities.

In this case, neither conventional nor legal subrogation exists. Therefore, the district court erred in providing for equitable subrogation, which is not permitted under Louisiana law. We, nevertheless, affirm the district court's transfer of rights from the Diocese to Gallagher. In passing, Gallagher mentions that only the Diocese has standing to challenge the court's transfer of its right to Gallagher. And the Diocese did not object to the court's subrogation. Obviously, Interstate has some reason to think that the rights are more dangerous in the hands of Gallagher than in the hands of the Diocese. But as far as the law is concerned, the subrogation paragraph did not adversely affect Interstate's rights. *See Dairyland Ins. Co. v. Makover,* 654 F.2d 1120, 1123 (5th Cir. Unit B Sept.1981) (applying the rule that "ordinarily only a litigant who was a party below and who is aggrieved by the judgment or order may appeal"). Accordingly, the district court's ruling on subrogation must be affirmed.[7]

_____

[7]In response to Interstate's appeal, Gallagher argues that this court lacks jurisdiction because Interstate's notice of appeal is technically deficient. This argument is without merit. Interstate stated that it was appealing "from the Final Judgment entered on August 30, 1995, and from the March 10, 1995 Partial Summary Judgment, if the August 30, 1995 Final Judgment is interpreted to have modified or amended the judgment in favor of Interstate Fire & Casualty Company in the March 10, 1995 Partial Summary Judgment." Gallagher would have us read the conditional

35

V

For the foregoing reasons, we AFFIRM the district court's judgment against Gallagher for occurrences during the first year of plan coverage and REVERSE and REMAND as to this judgment for occurrences during the second year of plan coverage; AFFIRM the district court's judgment against LACOS; and AFFIRM paragraph four of the district court's final judgment (which pertains to subrogation).

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

I concur in the analysis and holdings of parts II(A), II(E), III, and IV of the majority opinion. I concur also as to certain limited holdings in part II(B). I respectfully dissent, however, as to the remainder of II(B) and as to parts II(C) and (D). I write now to set forth my reasons for these positions.

I.

I concur in part II(A) of the majority opinion, which holds that certain language from our Court's prior opinion in *Society of the Roman Catholic Church v. Interstate Fire & Casualty Co.,* 26 F.3d 1359 (5th Cir.1994) [hereinafter *Society I* ], does not bar Gallagher from contending that there is a triable issue over whether it expressly warranted that the Diocese was fully insured.

---

clause as applying to the entire sentence. But it applies only to the phrase "from the March 10, 1995 Partial Summary Judgment." Interstate's notice of appeal adequately indicated that it was appealing the Final Judgment unconditionally. And according to Interstate, Gallagher did not raise the issue of subrogation below, so Interstate never had an opportunity to contest it. Thus, Interstate has not waived its right to appeal the issue.

*See ante,* at 397 (quoting *Society I,* 26 F.3d at 1367). In essence, the majority categorizes this quote as dicta, pointing out that "what the [*Society I* ] panel really meant ... was that there was a genuine dispute of material fact over whether the Diocese's claim is contractual; and, so, the [*Society I* ] panel simply held that the Diocese's claim was not delictual as a matter of law and thus the district court wrongfully granted Gallagher summary judgment (and this is the most the panel *could* have held)." *Ante,* at 397-98.

While the majority does not discuss it, I am concerned by the fact that the district court, in rendering summary judgment in favor of the Diocese after remand, quoted the same *Society I* language. I think it is therefore highly probable that the district judge treated the statement in *Society I* not as dicta, but rather as a ruling which dictated a grant of summary judgment in favor of the Diocese after remand. I cannot fathom any other reason why the district judge would have referred to it in his summary judgment determination, and from my review of this record I have serious doubts that the district judge would have granted summary judgment in favor of the Diocese if the opinion in *Society I* had not included the quoted language, but had instead said what the majority opinion now says the panel in *Society I* "really meant" to say.

## II.

### A.

I concur with the language of part II(B) of the majority

37

opinion which disposes of the Diocese's contentions regarding "unilateral" or "gratuitous" contracts. Likewise, I concur with the majority's determination in part II(B) that the contractual relationship between Gallagher and the Diocese was for a term of one year only with the parties being able to renew and extend that contractual relationship for subsequent years by making renewal agreements each year. Finally, I also concur with the majority's determination in part II(B) that, with regard to the "second year of plan coverage," there was a genuine dispute of material fact as to whether Gallagher made an express warranty.

B.

I cannot concur with and therefore dissent from the majority's determination in part II(B) that, "with regard to the first year of plan coverage, there is no genuine dispute of a material fact over whether Gallagher expressly warranted that the Diocese would be fully insured for all losses above the loss fund." *Ante,* at 403. From my reading of the summary judgment record in this case, I think there is sufficient evidence upon which a jury could reasonably conclude that the "fully insured" language in the first plan proposal did not create an express warranty by Gallagher that the Diocese would be fully insured for all losses above the loss fund.

The best example of the evidence upon which I think a jury could so conclude is the parties' actions following the "rash of mysterious arson fires" which occurred during the first year of the plan. *See ante,* at 395-96. The losses sustained by the Diocese

38

from these arson fires were of such number and magnitude as to make readily apparent that the loss fund of $400,000 for the first year would not be adequate to absorb the losses involved and also pay the other losses which the parties had estimated would need to be covered by the loss fund. If the Diocese truly believed that the "fully insured" language in the first-year proposal created an express warranty by Gallagher that the Diocese would never have to pay more than $400,000 on losses in the first year, then surely the Diocese would have immediately asserted its rights under that express warranty and called upon Gallagher to pay the losses chargeable for the first year against the loss fund in excess of the $400,000 upper limit. I could find absolutely nothing in the summary judgment record which indicated that the Diocese ever asserted such a right at that time; accordingly, I think a reasonable jury could infer that at the time of the "rash of mysterious arson fires" the parties did not construe the language of the first-year proposal as creating such an obligation on the part of Gallagher.

Likewise, when the parties addressed the task of entering into the renewal agreement for the second year of the plan, the renewal proposal did not include any "written explanatory material assuring the Diocese that it was "fully insured' over the loss fund." *Ante,* at 396. If the Diocese truly considered the "fully insured" language in the first proposal as creating an express warranty on the part of Gallagher, one would expect the Diocese to raise some objection about the exclusion of this language in the second

39

proposal. From my examination of the summary judgment record, I saw no indication that that was the position taken by the Diocese. Consequently, I think a jury could reasonably infer that the Diocese did not consider the "fully insured language" as an express warranty on the part of Gallagher because (i) they did not insist on compliance therewith during the first year of the plan, and (ii) they did not raise any objection to the elimination of this language in the proposal for the second year.

In reviewing a grant of summary judgment, we are required to "construe all facts and inferences in the light most favorable to the nonmoving party," *see ante,* at 393, which in this circumstance is Gallagher. Consequently, I would not distinguish the first year from the second year of the plan. I would simply send the whole issue of what the parties intended by use of the "fully insured language" for trial on the merits by the jury.

C.

I cannot concur with the majority's holding that "[t]he Diocese had no duty to provide Gallagher with information about possible future losses either when the parties entered the plan or during the plan's initial year." *Ante,* at 402-03. The majority cites no case law or statute to support that proposition regarding the duty owed by a proposed insured to the agent who is going to arrange insurance coverage for the insured. While I cannot cite any Louisiana case which deals specifically with the situation of proposed insured and its insurance agent, I read the opinion of the Louisiana Supreme Court in *Bunge Corp. v. GATX Corp.,* 557 So.2d

40

1376 (La.1990), as a broad overview of the circumstances in which disclosure is required. In that opinion, the Louisiana Supreme Court stated: "Modern law ... imposes on parties to a transaction a duty to speak whenever justice, equity and fair dealing demand it." *Bunge,* 557 So.2d at 1383 (quoting W. Page Keeton, *Fraud—Concealment and Non-Disclosure,* 15 TEXAS L. REV. 1, 15 (1936)). Furthermore, the Louisiana Supreme Court stated in that same opinion:

> It has long been held that the duty to disclose exists where the parties stand in some confidential or fiduciary relation to one another, such as that of *principal and agent* or executor and beneficiary of an estate.

*Id.* 557 So.2d at 1383-84 (footnote omitted and emphasis supplied). We are bound to apply Louisiana law in this diversity case, and I think that under the language and philosophy of *Bunge* we should hold that there is a duty upon a proposed insured to disclose to the insurance agent all of the knowledge and awareness which the insured might have as to possible claims and risks for which the proposed insured wants to be protected by insurance. I think that duty would be particularly applicable in the circumstances of the present case where the Diocese now claims that Gallagher gave it an express warranty that it would be fully insured and yet did not tell Gallagher about the incidents of molestation which had already occurred. There is sufficient summary judgment evidence of such prior knowledge on the part of the Diocese as to raise a triable issue that the Diocese had knowledge which was not disclosed.

The possible liability which the Diocese would face as a result of sexual molestation of young boys by its priests is, in my

view, not the sort of standard or typical risk which a reasonably prudent insurance agent would be expected to anticipate in arranging for insurance coverage. If the Diocese wanted to be "fully insured" as to that particular risk, it should have fully disclosed the nature and extent of the prior incidences of sexual molestation by its priests. The summary judgment record in this case indicates that Gallagher made inquiries about the loss experience of the Diocese in prior years and tailored its plan based upon that prior loss experience. The task of an insurance agent in designing the types and levels of insurance coverage so that an insured may be "fully insured" cannot be done unless the agent knows all of the types of risks and claims to which the insured is exposed. In my view there is a triable jury issue as to whether the phrase "fully insured" constituted an express warranty by Gallagher, but even assuming it did, I think fairness and justice and the language of *Bunge* would say that there is a legitimate jury issue as to (i) whether the Diocese knew and failed to disclose to Gallagher the risk of sexual molestation claims as a result of the conduct of pedophilic priests and (ii) whether Gallagher should be held for liability under its special warranty as to a risk which was not a standard and ordinary risk and which was a risk of which it had no prior knowledge.

D.

In my view, there are innumerable fact issues which a jury should decide. Undoubtedly, Gallagher's sales representatives used a lot of puffery in selling their program to the Diocese. The

Diocese demonstrated by its actions, however, that it recognized that it was just puffery and not a special contractual warranty. Everything was working fine until the landslide of the sexual molestation cases hit. Because there were so many of these claims and the dollar amount of each claim was so high, the layer of Lloyd's excess coverage was burned up by the first few settlements of the child molestation claims. As a consequence, the Diocese had to pay the first $550,000 of each later claim rather than just the first $100,000. A jury might find that at that point, the Diocese decided that it would go back and change the puffery into a special contractual warranty and shift the loss to Gallagher. Gallagher responds that it was the Diocese's employee, the priest, who was committing all of the acts of sexual molestation, and the Diocese knew about it and did not tell Gallagher. How, Gallagher asks, could it be expected to design an insurance plan that would adequately cover a risk it did not know about? The place to sort out all of these cross-currents of claims and factual disputes is before the trial jury, and under the facts available in this case, the jury could find either for the Diocese or for Gallagher and the evidence would support either finding. Summary judgment in favor of the Diocese was, therefore, error.